1  William N. Lobel (CA Bar No. 93202)
   PACHULSKI STANG ZIEHL & JONES LLP
2  650 Town Center Drive, Suite 1500
   Costa Mesa, CA  92626
3  Telephone:  (714) 384-4740
   Facsimile:  (714) 384-4741
4  E-mail:     wlobel@pszjlaw.com

5  [Proposed] Attorneys for Ruby's SoCal Diners,
   a Delaware corporation, *et al.*, Debtors and
6  Debtors-in-Possession

7

8                UNITED STATES BANKRUPTCY COURT

9                CENTRAL DISTRICT OF CALIFORNIA

10                     SANTA ANA DIVISION

11 In re:                                    Case Nos.: 8:18-bk-13197-CB; 8:18-bk-
                                             13198-CB; 8:18-bk-13199-CB; 8:18-bk-
12 RUBY'S SOCAL DINERS, LLC,                 13200-CB; 8:18-bk-13201-CB; 8:18-bk-
   a Delaware limited liability company, *et al.*,[1]  13202-CB;
13
           Debtors and Debtors-in-          Chapter 11
14         Possession,
                                            NOTICE OF EMERGENCY MOTION
15 Affects:                                 AND EMERGENCY MOTION BY
                                            DEBTORS FOR ORDER
16 ☒ All Debtors                            (A) AUTHORIZING INTERIM USE OF
                                            CASH COLLATERAL, (B) GRANTING
17 ☐ RUBY'S SOCAL DINERS, LLC, ONLY         ADEQUATE PROTECTION FOR USE
                                            OF PREPETITION COLLATERAL,
18 ☐ RUBY'S QUALITY DINERS, LLC, ONLY       AND (C) GRANTING RELATED
                                            RELIEF; MEMORANDUM OF POINTS
19 ☐ RUBY'S HUNTINGTON BEACH, LTD., ONLY    AND AUTHORITIES IN SUPPORT

20 ☐ RUBY'S LAGUNA HILLS, LTD. ONLY         [Declaration of Douglas S. Cavanaugh in
                                            Support of First Day Motions filed
21                                          concurrently herewith]
22 ☐ RUBY'S OCEANSIDE, LTD., ONLY
                                            Date:    August 31, 2018
23 ☐ RUBY'S PALM SPRINGS, LTD., ONLY        Time:    10:00 a.m.
                                            Place:   Courtroom 5D
24                                                   411 West Fourth Street
                                                     Santa Ana, CA  92701
25

26

27

28
   ---
   [1] The last four digits of the Debtors' federal tax identification numbers are as follows: Ruby's SoCal Diners, LLC
   (9782); Ruby's Quality Diners, LLC 1539); Ruby's Huntington Beach, Ltd. (1331); Ruby's Laguna Hills, Ltd. (6603);
   Ruby's Oceanside, Ltd. (9104); and Ruby Palm Springs, Ltd. (9627).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

# **TABLE OF CONTENTS**

**Page**

I. STATEMENT OF FACTS ................................................................................................. 5

   A.   Jurisdiction and Venue ......................................................................................... 5

   B.   Background ............................................................................................................ 5

   C.   General Description of the Debtor ....................................................................... 5

   D.   Overview of the Debtors and Its Affiliates' Business Operations ....................... 5

   E.   The Debtors and Their Affiliates' Corporate Structure ..................................... 5

   F.   The Debtors' Secured Debt ................................................................................. 6

      1.   Opus Bank ................................................................................................. 6

      2.   C&C Partnership ........................................................................................ 7

      3.   Pillsbury Winthrop Shaw Pittman LLP ................................................... 7

      4.   Plaza Bonita, LLC .................................................................................... 8

II. RELIEF REQUESTED ................................................................................................... 8

III. ARGUMENT ................................................................................................................ 11

   A.   The Debtors Should Be Authorized to Use Cash Collateral to Operate, Maintain and Preserve Their Business ................................................................................ 11

   B.   The Secured Creditors Are Adequately Protected By the Debtors' Use Of Cash Collateral to Operate the Business and By the Granting of Replacement Liens to the Extent of Any Diminution of Their Collateral ............................................... 12

   C.   Emergency Relief and Interim Approval of the Debtors' Use of Cash Collateral Should Be Granted Pending a Final Hearing ..................................................... 15

IV. CONCLUSION .............................................................................................................. 16

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

## Cases

First Federal Bank of California v. Weinstein (In re Weinstein),
227 B.R. 284 (B.A.P. 9th Cir. 1998)..................................................................9

General Electric Mortgage Corp. v. South Village, Inc. (In re South Village, Inc.),
25 B.R. 987 (Bankr. D. Utah 1982)..................................................................9

In re 495 Cent. Park Ave. Corp.,
136 B.R. 626 (Bankr. S.D.N.Y. 1992)..............................................................10

In re Columbia Gas Sys., Inc.,
146 B.R. 114 (Bankr. D. Del. 1992)..................................................................10

In re Deico Elecs., Inc.,
139 B.R. 945 (B.A.P. 9th Cir. 1992)..................................................................9

In re Dynaco Corp.,
162 B.R. 389 (Bankr. D.N.H. 1993)..............................................................7, 11

In re Immenhausen Corp.,
164 B.R. 347, 352 (Bankr. M.D. Fla. 1994)......................................................11

In re Martin,
761 F.2d 472 (8th Cir. 1985)..........................................................................10

In re Mickler,
9 B.R. 121 (Bankr. M.D. Fla. 1981)..................................................................7

In re Newark Airport/Hotel Ltd. Partnership,
156 B.R. 444, 450 (Bankr. D.N.J. 1993)..........................................................11

In re Oak Glen R-Vee,
8 B.R. 213, 216 (Bankr. C.D. Cal. 1981)............................................................7

In re Shaw Indus., Inc.,
300 B.R. 861 (Bankr. W.D. Pa. 2003)..............................................................10

In re Stein,
19 B.R. 458 (Bankr. E.D. Pa. 1982)..............................................................7, 11

In re Swedeland Dev. Group, Inc.,
16 F.3d 552 (3d Cir. 1994)..............................................................................10

In re Triplett,
87 B.R. 25 (Bankr. W.D. Tex. 1988)................................................................11

In re Tucson Industrial Partners,
129 B.R. 614 (9th Cir. B.A.P. 1991)..................................................................7

Matter of Pursuit Athletic Footwear, Inc.,
193 B.R. 713 (Bankr. D. Del. 1996)................................................................11

MBank Dallas, N.A. v. O'Connor (In re O'Connor),
808 F.2d 1393 (10th Cir. 1987)........................................................................8

McCombs,
88 B.R. at 266..............................................................................................11

O'Connor,
808 F.2d at 1937..........................................................................................12

United Savings Assoc. of Texas v. Timbers of Inwood Forest Assoc., Ltd.,
484 U.S. 365, 108 S. Ct. 626, 98 L. Ed. 2d 740 (1988)..................................9, 10

## Statutes

11 U.S.C. § 1107(a)......................................................................................1, 6
11 U.S.C. § 1108............................................................................................1
11 U.S.C. § 363..............................................................................................6
11 U.S.C. § 363(a)........................................................................................5, 6
11 U.S.C. § 363(c)..........................................................................................2
11 U.S.C. § 363(c)(2)......................................................................................6
11 U.S.C. § 363(c)(2)(A)..................................................................................6
11 U.S.C. § 363(c)(2)(B)................................................................................6, 7
11 U.S.C. § 363(c)(3)....................................................................................10
11 U.S.C. § 363(c)(l)......................................................................................6

11 U.S.C. § 363(e) .......................................................................................................... 8
11 U.S.C. § 506(a) .......................................................................................................... 9
11 U.S.C. §§ 101-1530 .................................................................................................. 2
28 U.S.C. §§ 1334 .......................................................................................................... 1
28 U.S.C. § 157(b)(2) ..................................................................................................... 1
28 U.S.C. §§ 1408 .......................................................................................................... 1
28 U.S.C. §§ 1409 .......................................................................................................... 1
28 U.S.C. §§ 157 ............................................................................................................ 1

**Rules**

F.R.B.P. 2081-1(9) ......................................................................................................... 2
F.R.B.P. 4001-2 .............................................................................................................. 2
L.B.R. 4001-2(a) ....................................................................................................... 2, 11
L.B.R. 4001-2(b) .......................................................................................................... 11
L.B.R. 9075-1 ................................................................................................................. 2
L.B.R.4001(b)(2) .......................................................................................................... 11

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

**TO THE HONORABLE CATHERINE E. BAUER, UNITED STATES BANKRUPTCY**

**JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, THE 20 LARGEST**

**UNSECURED CREDITORS, SECURED CREDITORS, AND OTHER PARTIES IN**

**INTEREST:**

       **PLEASE TAKE NOTICE** that Ruby's SoCal Diners, LLC, a Delaware limited liability

company ("SoCal Diners"); Ruby's Quality Diners, LLC, a Delaware limited liability company

("Quality"); Ruby's Huntington Beach, Ltd., a California limited partnership ("Ruby's Huntington

Beach"); Ruby's Laguna Hills, Ltd., a California limited partnership ("Ruby's Laguna Hills");

Ruby's Oceanside, Ltd., a California limited partnership ("Ruby's Oceanside"); and Ruby's Palm

Springs, Ltd., a California limited partnership ("Ruby's Palm Springs") (collectively, the

"Debtors"), hereby move (the "Motion") this Court for an order (1) approving the use of cash

collateral on an emergency interim basis, subject to its budget attached hereto as **Exhibit "A"** (the

"Budget") and pending a final hearing, in such amounts necessary to enable the Debtors to operate

their business and avoid immediate and irreparable harm; (2) granting adequate protection to the

Debtors' secured creditors with an interest in cash collateral (defined herein as the "Secured

Creditors") on an interim basis; and (3) scheduling and establishing deadlines regarding a final

hearing on the Debtors' use of cash collateral.

       **PLEASE TAKE FURTHER NOTICE** that this Motion is brought pursuant to section

363(c) of the Bankruptcy Code, 11 U.S.C. §§ 101-1530, as amended (the "Bankruptcy Code"), Rule

4001(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rules 2081-1(9),

4001-2 and 9075-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the

Central District of California (the "Local Bankruptcy Rules").

       **PLEASE TAKE FURTHER NOTICE** that the essential terms of the Debtors' proposed

cash collateral use are as follows:

-     The Motion does not request approval of any of the provisions set forth in the
  currently filed *Statement Regarding Cash Collateral or Debtor in Possession
  Financing* filed in accordance with Local Bankruptcy Rule 4001-2(a) (the
  "Statement").

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

- The Motion seeks authorization to use cash currently on hand in the Debtors' estates and funds generated from the operation of the Debtors' business pursuant to the Budget appended hereto as **Exhibit "A"** on an interim basis through the final hearing on this Motion, and thereafter on a final basis through November 25, 2018.

- The Motion proposes to grant to (1) Opus Bank ("Opus"); (2) C&C Partnership ("C&C"), (3) Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury"); and (4) Plaza Bonita, LLC ("Plaza Bonita") (collectively, the "Secured Creditors"), replacement liens on their existing collateral and the proceeds thereof excluding avoidance causes of action, as adequate protection if and only to the extent that (a) their respective prepetition security interests are valid, enforceable, properly perfected and non-avoidable, and (b) the Debtors' use of cash collateral results in a diminution in cash collateral.

**PLEASE TAKE FURTHER NOTICE** that the Motion is based on the attached Memorandum of Points and Authorities, the *Declaration of Douglas S. Cavanaugh in Support of First Day Motions* (the "Cavanaugh Declaration"), the arguments of counsel, and other admissible evidence properly brought before the Court at or before the hearing on this Motion.  In addition, the Debtors request that the Court take judicial notice of all documents filed with the Court in these cases.

**PLEASE TAKE FURTHER NOTICE** that any opposition or objection to the Motion must be filed with the Court and served on proposed counsel for the Debtors at the above address any time before the hearing or may be presented at the hearing on the Motion.  Failure to timely object may be deemed by the Court to constitute consent to the relief requested herein.

**PLEASE TAKE FURTHER NOTICE** that the Debtors will serve this Notice and Motion and the attached Memorandum of Points and Authorities, and the Cavanaugh Declaration, on: (1) the Office of the United States Trustee; (2) the creditors appearing on the lists filed in accordance with Fed. R. Bankr. P. 1007(d) by the Debtors unless and until an official committee of unsecured creditors (the "Committee") is appointed, then in that event, to counsel to the Committee; (3) parties that file with the Court and serve upon the Debtors request for notice of all matters in accordance with Bankruptcy Rule 2002(i); (4) the United States of America; (5) the State of California; and (6) the Secured Creditors or their counsel of record.

**PLEASE TAKE FURTHER NOTICE** that, to the extent necessary, the Debtors request that the Court waive compliance with Local Bankruptcy Rule 9075-1(a)(1) and approve service (in

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

addition to the means of service set forth in such Local Bankruptcy Rule) by overnight delivery or email.  In the event that the Court grants the relief requested by the Motion, the Debtors shall provide notice of the entry of the order granting such relief upon each of the foregoing parties and any other parties in interest as the Court directs.  The Debtors submit that such notice is sufficient and that no other or further notice be given.

**WHEREFORE**, for all the foregoing reasons, and such additional reasons as may be advanced at or prior to the hearing on the Motion, the Debtors respectfully request that this Court enter an order, in the form attached hereto as **Exhibit "B"**: (1) approving the use of cash collateral on an emergency interim basis, subject to the Budget and pending a final hearing, in such amounts necessary to enable the Debtors to operate their business and avoid immediate and irreparable harm, (2) granting adequate protection to the Secured Creditors on an interim basis, (3) scheduling and establishing deadlines regarding a final hearing on the Debtors' use of cash collateral, and (4) granting such other and further relief as is just and proper under the circumstances.

Dated:    August 30, 2018          PACHULSKI STANG ZIEHL & JONES LLP


                                    By:    */s/ William N. Lobel*
                                           _____
                                           William N. Lobel
                                           [Proposed] Attorneys for Ruby's SoCal
                                           Diners, a Delaware corporation, *et al.*,
                                           Debtors and Debtors-in-Possession

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## STATEMENT OF FACTS

### A.    Jurisdiction and Venue

This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

### B.    Background

On August 29, 2018 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors continue to operate their business and manage their affairs as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or committee has been appointed in these chapter 11 cases (the "Cases").

### C.    General Description of the Debtor

A detailed description of the Debtors' background, structure, operations and recent financial history is detailed in the concurrently filed Cavanaugh Declaration.

### D.    Overview of the Debtors and Its Affiliates' Business Operations

The Debtors and their affiliates (referred to from time to time herein as the "Company") own, operate and manage restaurants under the trade names "Ruby's®," "Ruby's® Diner," "The Ruby Restaurant Group," "Ruby's® Dinette" and "Ruby's® Shake Shop."  The Company has operated Ruby's® Diner restaurants since 1985 and is known as a purveyor of very popular burgers, fries and shakes.

### E.    The Debtors and Their Affiliates' Corporate Structure[2]

SoCal Diners is 100% owned and managed by Ruby's Diners, Inc., a California corporation ("RDI").  RDI has not filed a chapter 11 case concurrently with the Debtors herein.[3]

---

[2] A chart depicting the Company's corporate structure is attached to the Cavanaugh Declaration as Exhibit "1."

[3] Opus is a secured lender to the Debtors herein, but is not a lender to RDI.  The chapter 11 filings by the Debtors were precipitated by Opus seeking appointment of a receiver over the Debtors and their assets and operations.  While the

SoCal Diners is the 100% owner and sole and managing member of Quality.  SoCal Diners is the general partner and 50% owner, and Quality is the limited partner and 50% owner, of the following California limited partnerships: (1) Ruby's Huntington Beach, which owns and operates a Ruby's® restaurant on the pier in Huntington Beach, California and is a Debtor herein; (2) Ruby's Oceanside, which owns and operates a Ruby's® restaurant in Oceanside, California and is a Debtor herein; (3) Ruby's Palm Springs, which owns and operates a Ruby's® restaurant in Palm Springs, California and is a Debtor herein; and (4) Ruby's Laguna Hills, which owns and operates a Ruby's® restaurant in the Laguna Hill Mall in Laguna Hills, California[4] and is a Debtor herein[5] (collectively, the "SoCal Entities" and the restaurants owned by the SoCal Entities, the "SoCal Restaurants").[6]

The use of Cash Collateral is critical to the Debtors' ability to operate their restaurant business and maximize the value of the Debtors' estates for the benefit of all parties.

**F.    The Debtors' Secured Debt**

1.    Opus Bank

On or about July 26, 2013, the Debtors and Opus Bank ("Opus") entered into a loan agreement for a term loan in the original principal amount of $5,000,000, and a term loan in the original principal amount of $300,000.  On or about April 8, 2014, the Debtors and Opus entered into a business loan agreement in the original principal amount of $500,000.   On or about November 14, 2014, the Debtors and Opus entered into a business loan agreement in the original

---

Debtors attempted to negotiate with Opus, ultimately, the parties were unable to resolve their issues, necessitating the filing of the Cases.

[4] The Debtors anticipate that, due to significant, continuing construction projects underway at the Laguna Hills Mall, the Laguna Hills restaurant will close following the Petition Date.

[5] SoCal and Quality also own Ruby's Mission Valley, Ltd., which until a few months prior to the Petition Date, owned and operated a Ruby's® restaurant in the Westfield Mission Valley Mall in San Diego, California.  The Mission Valley restaurant was closed prior to the Petition Date, in April 2018.  Ruby's Mission Valley, Ltd. is not a debtor entity.

[6] As set forth in the corporate chart (**Exhibit "1"** hereto), RDI also holds ownership interests in, and management roles in connection with, the following joint venture entities:  (1) RDI is the managing member and 70% owner of Ruby's Beach Ventures LLC, which owns and operates a Ruby's® restaurant in Long Beach, California; (2) RDI is the general partner and 50% owner of Ruby's Diner South Coast Plaza LP, which owns and operates a Ruby's® restaurant at South Coast Plaza Mall in Costa Mesa, California; (3) RDI is the managing member and sole owner of Ruby's Woodbridge LLC, which owns and operates a Ruby's® restaurant in Woodbridge in Irvine, California; and (4) RDI is the managing member and 50% owner of Ruby's Spectrum LLC, which until a few months prior to the Petition Date, owned and operated a Ruby's® restaurant at the Irvine Spectrum in Irvine, California.  As of the Petition Date, there also were twenty-four (24) Ruby's® Diner franchises (or licensed units) located in Southern California, Pennsylvania, New Jersey, Nevada and Texas that were owned and, with certain limited exceptions, operated by independent third parties.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

6

principal amount of $105,000. Such loan agreements, and related notes and security agreements, as amended on February 16, 2016, March 31, 2017 and July 31, 2017 or otherwise, are referred to herein as the "Opus Loans"). The Opus Loans are secured by substantially all of the Debtors' assets (including cash and a pledge of the assets of the SoCal Restaurants), as reflected by the UCC Financing Statements filed with the Delaware Secretary of State on July 29, 2013 (Filing No. 20132935915) and California Secretary of State on October 19, 2016 (Filing No. 16-7551665002). The Opus Loans, in the original principal amount of $5,905,000, were significantly paid down in October 2016. The maturity date of the Opus Loans was December 31, 2017. As of the Petition Date, the Debtors owed a total of approximately $2.2 million to Opus under the Opus Loans.

On or about April 2, 2018, Opus filed a Complaint for Breach of Loan Agreements in the Orange County Superior Court and thereafter sought the appointment of a receiver to take control of the assets serving as collateral for the Opus Loans. Notwithstanding the Debtors' attempts to resolve the issues with Opus, Opus ultimately determined to move forward with its receivership proceeding, necessitating the filing of these chapter 11 cases to preserve value for all parties.

2.    C&C Partnership

On or about April 18, 2018, C&C Partnership ("C&C") entered into a secured promissory notice and related security agreement, and recorded a UCC Financing Statement against SoCal Diners, Ruby's Huntington Beach, Ruby's Oceanside and Ruby's Palm Springs with the Secretary of State of California (Filing Nos. 187644361282, 187644368138, 187644368259 and 187644368370) in the amount of $250,000.

3.    Pillsbury Winthrop Shaw Pittman LLP

On or about June 14, 2018, Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury") recorded a Notice of Judgment Lien (Filing No. 18-7654307617) against SoCal Diners, Quality, Ruby's Huntington Beach, Ruby's Oceanside and Ruby's Palm Springs with the Secretary of State of California in the amount of $617,452.74.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

4.    Plaza Bonita, LLC

On or about July 3, 2015, Plaza Bonita, LLC ("Plaza Bonita") recorded a Notice of Attachment Lien (Filing No. 15-7473297702) against SoCal Diners in connection with a lease guaranty settlement agreement.  As of the Petition Date, the amount owed to Plaza Bonita by SoCal Diners under the settlement agreement is $58,200.[7]

Collectively, Opus Bank, C&C, Pillsbury and Plaza Bonita are referred to herein as the "Secured Creditors" and the cash that serves as collateral for the obligations to the Secured Creditors, the "Cash Collateral."

The Debtors and the estates reserve all rights with respect to any challenge to the validity and/or scope of the prepetition claims and liens of the Secured Creditors, or the avoidability thereof. Nothing herein is intended to waive the rights of the Debtors (or any Committee appointed in the Cases or other interested party) with respect to such issues.

## II.

## RELIEF REQUESTED

In order to address their working capital needs and fund their reorganization efforts, the Debtors require the use of what may be the Cash Collateral of the Secured Creditors in accordance with the Budget attached herein as **Exhibit "A"** on an interim basis through the final hearing on this Motion, and on a final basis through December 31, 2018.  The use of Cash Collateral will provide the Debtors with the necessary funding with which to operate their businesses, pay their vendors, employees and other costs of operations,[8] maximize value – including the value of the Secured Creditors' existing collateral – and pursue a restructuring of their financial affairs.

In addition, Ruby's Huntington Beach, Ltd. is about to begin a refurbishment of the restaurant on the Huntington Beach Pier.  That refurbishment is required by the lease of that location

---

[7] The settlement agreement with Plaza Bonita provides for a settlement amount of $175,000 to be paid over time.  SoCal made the payments to Plaza Bonita until May 2018.  The settlement agreement provides for a springing obligation (in the amount of $244,902) upon default.  Therefore, this obligation could be asserted against SoCal Diners in a higher amount, less an offset for the payments made prior to default, which payments are in the amount of approximately $116,800.

[8] All of the Debtor's employees are employed through RDI.  In the ordinary course of business, the Debtors' provide RDI with the funding necessary to meet payroll for their respective employees and related expenses.  The Debtors also pay weekly management fees to RDI, which supplies management services to all of the Debtors.  There are no management services or expenses at the Debtor's themselves.  The Debtors seek Court authority to continue providing such funding to RDI in order to pay such employee-related expenses and management fees.

from the City of Huntington Beach. A failure to begin that refurbishment immediately will result in a breach of the lease with the City of Huntington Beach, which would be extremely detrimental to the Debtors' prospects for reorganizations.

The amount of the refurbishment and the management fees included in the attached budget and out of an abundance of caution, Debtors seek authorization to use cash collateral for that purpose.

RDI also pays all of the premiums on the various insurance policies insuring various aspects of the Debtors' businesses and assets. The Debtors routinely reimburse RDI for those insurance expenditures. Authorization is sought herein to continue that practice and to use Secured Creditors cash collateral to reimburse RDI for actual insurance premiums paid by RDI on behalf of the Debtors.

Indeed, as indicated by Opus in its Motion to appoint a receiver, the use of cash collateral is critical to maximizing value in the Debtors' cases. As set forth by Opus:

> [T]he value of the Collateral directly depends on the restaurants continuing to operate as going concerns, and Opus has no guarantee that [the Debtors] will continue to operate the restaurants. As long as [the Debtors] maintains control of the Collateral, [the Debtors] may decide, at any moment, to shutter any or all of the restaurants. Doing so would significantly devalue the Collateral, for the simple reasons that the whole is worth more than the sum of its parts—a currently operating Ruby's Diner restaurant, with its name, reputation, good will, and local following, is of much greater value than the individual booths, ovens, or ranges by themselves.

Motion to Appoint Receiver, page 5, lines 20-26. Thus, it is undisputed that the use of Cash Collateral is critical to the Debtors' ongoing operations and will maximize value to all parties.[9]

The Debtors seek to use Cash Collateral and to grant to the Secured Creditors, as adequate protection of their interests in the Cash Collateral and solely to the extent of any diminution in value of the Cash Collateral, replacement security interests in and liens upon their existing collateral and any proceeds thereof, as set forth below.

---

[9] There is no risk that the Debtors will "shutter" any restaurants post-petition without seeking Court approval for such actions. Thus, any concern by Opus in this regard has been nullified by the chapter 11 filings and the oversight of this Court.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

The Debtors have developed cashflow projections reflecting anticipated revenue and expenditures through the first 13 weeks of the Cases, contained in the proposed budget (the "Budget") attached hereto as **Exhibit "A,"** provided that the Debtors seek authority to exceed Fifteen percent 15%) of the aggregate of the weekly expenditures reflected on the Budget, measured on a four-week rolling basis. The Budget sets forth the amount of cash necessary for the Debtors to operate their businesses postpetition. The Budget takes into account the effect this bankruptcy filing may have on the Debtor's business and the expenses of the administration of these Cases.

As set forth in the Budget, the Debtors seek authority to use cash on hand as of the Petition Date and funds generated from operation of their businesses. Such cash and receipts allegedly constitute the Secured Creditors' "cash collateral" within the meaning of section 363(a) of the Bankruptcy Code.

The Budgets contain as a source of cash the proceeds of debtor in possession financing. The Debtors chapter 11 cases were filed on an emergency basis due to a failure to obtain a continuance of a hearing on a motion by Opus Bank for the appointment of a receiver over the Debtors. The lead case, for RDI, the direct or indirect parent of all of the Debtors, will be filed during the week of September 4, 2018.

That case will be assigned to this Court pursuant to the applicable Bankruptcy Court procedures. Among the first day motions in the RDI chapter 11 case will be a motion to approve debtor in possession financing in the principal amount of two million dollars ($2,000,000). That financing will have been approved by this Court before the final hearing on Debtors' use of cash collateral.

The Debtors request that the Court conduct an interim hearing, pursuant to Bankruptcy Rule 4001(b), to consider the entry of the interim order in substantially the form of the attached **Exhibit "B"**: (1) approving the use of Cash Collateral on an emergency interim basis, pending a final hearing, in accordance with the Budget, to enable the Debtors to operate their businesses and avoid immediate and irreparable harm to the estates, (2) granting adequate protection to the Secured Creditors on an interim basis, and (3) scheduling and establishing deadlines regarding a final hearing on the Debtors' use of Cash Collateral.

# III.

## ARGUMENT

**A.    The Debtors Should Be Authorized to Use Cash Collateral to Operate, Maintain and Preserve Their Business**

A debtor's use of property of the estate is governed by Section 363 of the Bankruptcy Code. Section 363(c)(l) provides in pertinent part:

> If the business of the debtor is authorized to be operated under section . . . 1108. . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C.§ 363(c)(l).  A debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with Section 363.  *See* 11 U.S.C. § 1107(a).

"Cash collateral" is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest. . . ."  11 U.S.C. § 363(a).  Section 363(c)(2) establishes a special requirement with respect to "cash collateral," providing that the trustee or debtor in possession may use "cash collateral" under subsection (c)(l) if:

> (A)  each entity that has an interest in such cash collateral consents; or
>
> (B)  the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

*See* 11 U.S.C. § 363(c)(2)(A) and (B).

It is well settled that it is appropriate for a chapter 11 debtor to use cash collateral for the purpose of maintaining and operating its property.  11 U.S.C. § 363(c)(2)(B); <u>In re Oak Glen R-Vee</u>, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); <u>In re Tucson Industrial Partners</u>, 129 B.R. 614 (9th Cir. B.A.P. 1991).  Where the debtor is operating a business, it is extremely important that the access to cash collateral be allowed in order to facilitate the goal of reorganization: "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash collateral is necessary to operate a business."

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

In re Dynaco Corp., 162 B.R. 389 (Bankr. D.N.H. 1993), *quoting* In re Stein, 19 B.R. 458, 459 (Bankr. E.D. Pa. 1982).  Indeed, it is universally acknowledged that the debtor's cash "is the life blood of the business."  In re Mickler, 9 B.R. 121, 123 (Bankr. M.D. Fla. 1981).

In this case, the Debtors have an immediate need for the use of Cash Collateral in order to maintain their business operations.  The Debtor's expected use of Cash Collateral during the interim and final periods is reflected in the Budget.  All payments described in the Budget are necessary to maintain and continue the Debtors' operations and preserve their going-concern value for the benefit of the Debtors' creditors.  Specifically, the Debtors must have access to Cash Collateral to pay their vendors, employees, rent, utilities, debt service, costs related to the chapter 11, and other pertinent, ordinary expenses of their business.  Failure to make payments in accordance with the Budget would result in the cessation of the Debtors' business, causing immediate and irreparable harm to the Debtors' estates and their creditors.  Put simply, the Debtors cannot continue operations without the use of Cash Collateral, and if the Debtors are unable to operate, all parties will be harmed.

**B.**    **The Secured Creditors Are Adequately Protected By the Debtors' Use Of Cash Collateral to Operate the Business and By the Granting of Replacement Liens to the Extent of Any Diminution of Their Collateral**

To the extent that an entity has a valid security interest in the revenues generated by property, those revenues constitute "cash collateral" under Section 363(a) of the Bankruptcy Code.  If a secured creditor does not consent to the use of cash collateral,[10] the bankruptcy court can authorize the debtor in possession to use said cash collateral under section 363(c)(2)(B) of the Bankruptcy Code if the court determines that the debtor has provided "adequate protection" of the secured creditor's interest in the cash collateral.  *See e.g.,* In re Mellor, 734 F.2d 1396, 1400 (9th Cir. 1984); MBank Dallas, N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393, 1397-98 (10th Cir. 1987), In re McCombs Properties VI, Ltd., 88 B.R. 261, 265 (Bankr. C.D. Cal. l988).

Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used ... or proposed to be used ... by [a debtor in possession], the court, with or

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

---

[10] The Debtors believe that it is likely that certain of the Secured Creditors would consent to the proposed use of Cash Collateral, however, because of the urgent nature of the filings and the relief sought, the Debtors did not have the opportunity to seek such consent in advance of the filing of these Cases and this Motion.

1   without a hearing, shall prohibit or condition such use ... as is necessary to provide adequate

2   protection of such interest." 11 U.S.C. § 363(e). Although the term "adequate protection" is not

3   explicitly defined by the Bankruptcy Code, section 361 of the Bankruptcy Code provides that when

4   adequate protection is required, it may be provided by:

> (1) Requiring the trustee to make a cash payment or periodic cash
> payments to such entity, to the extent that the ... use ... under section
> 363 of this title ... results in a decrease in the value of such entity's
> interest in such property;
>
> (2) providing to such entity an additional or replacement lien to the
> extent that such ... use ... results in a decrease in the value of such
> entity's interest in such property; or
>
> (3) Granting such other relief ... as will result in the realizing by such
> entity of the indubitable equivalent in such entity's interest in such
> property.

Neither section 361 nor any other provision of the Bankruptcy Code defines the nature and

extent of the "interest in property" of which a secured creditor is entitled to adequate protection

under section 361. However, the statute plainly provides that a qualifying interest demands

protection only to the extent that the use of the creditor's collateral will result in a decrease in the

"value of such entity's interest in such property." 11 U.S.C. §§ 361, 363(e); see First Federal Bank

of California v. Weinstein (In re Weinstein), 227 B.R. 284, 296 (B.A.P. 9th Cir. 1998); In re Deico

Elecs., Inc., 139 B.R. 945, 947 (B.A.P. 9th Cir. 1992); General Electric Mortgage Corp. v. South

Village, Inc. (In re South Village, Inc.), 25 B.R. 987, 989-90 n.4 (Bankr. D. Utah 1982).

The phrase "value of such entity's interest" was addressed by the Supreme Court in the

landmark decision, United Savings Assoc. of Texas v. Timbers of Inwood Forest Assoc., Ltd., 484

U.S. 365, 108 S. Ct. 626, 98 L. Ed. 2d 740 (1988). For the meaning of "value of such entity's

interest," the Supreme Court was guided by section 506(a) of the Bankruptcy Code which defines a

secured creditor's claim – "The phrase 'value of such creditor's interest in § 506(a) means the value

of the collateral.' We think the phrase 'value of such entity's interest' in § 361(1) and (2), when

applied to secured creditors means the same." Id. at 630 (internal citations omitted). Timbers

instructs that a secured creditor is entitled to adequate protection only against the diminution in the

value of the collateral securing the creditor's allowed secured claim. Under Timbers, therefore,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

1    where the value of the collateral is not diminishing by its use, sale, or lease, the creditor's interest is

2    adequately protected.  This conclusion flows from the notion that the "value of such entity's

3    interests" is the equivalent to "value of the collateral."

4      What constitutes adequate protection must be decided on a case-by-case basis. *See* In re

5    Swedeland Dev. Group, Inc., 16 F.3d 552, 564 (3d Cir. 1994); O'Connor, 808 F.2d at 1396; In re

6    Martin, 761 F.2d 472 (8th Cir. 1985); In re Shaw Indus., Inc., 300 B.R. 861, 865 (Bankr. W.D. Pa.

7    2003); In re Columbia Gas Sys., Inc., 146 B.R. 114 (Bankr. D. Del. 1992).  The focus of the

8    requirement is to protect a secured creditor from diminution in the value of its interest in the

9    particular collateral during the period of use.  *See* Swedeland, 16 F.3d at 564  ("[T]he whole purpose

10    of adequate protection for a creditor is to insure that the creditor receives the value for which he

11    bargained pre-bankruptcy.") (internal quotation omitted); In re 495 Cent. Park Ave. Corp., 136 B.R.

12    626, 636 (Bankr. S.D.N.Y. 1992); In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y.

13    1986)

14      Courts have determined that a debtor's continued business operations can constitute the

15    adequate protection of a secured creditor.  *See* Matter of Pursuit Athletic Footwear, Inc., 193 B.R.

16    713 (Bankr. D. Del. 1996); In re Newark Airport/Hotel Ltd. Partnership, 156 B.R. 444, 450 (Bankr.

17    D.N.J. 1993); In re Dynaco, 162 B.R. 389, 394-5 (Bankr. D.N.H. 1993); In re Immenhausen Corp.,

18    164 B.R. 347, 352 (Bankr. M.D. Fla. 1994).  The preservation of the value of a secured creditor's

19    lien is sufficient to provide adequate protection to a secured creditor when a debtor seeks to use cash

20    collateral.  In re Triplett, 87 B.R. 25 (Bankr. W.D. Tex. 1988). *See also* In re Stein, 19 B.R. 458

21    (Bankr. E.D. Pa. 1982) (the court determined that the use of cash collateral was necessary to the

22    continued operations of the debtor, and that the creditor's secured position could only be enhanced

23    by the continued operation of the debtor's business); McCombs, 88 B.R. at 266 (the court determined

24    that the debtor's use of cash collateral for needed repairs, renovations and operating expenses

25    eliminated the risk of diminution in the creditor's interest in the cash collateral and such use would

26    more likely increase cash collateral).

27      In accordance with the foregoing authorities, and as described herein and in the Cavanaugh

28    Declaration, the Debtors' continued operations, including the necessity of paying their vendors and

the other necessary and appropriate expenses set forth in the Budget, will adequately protect the

Secured Creditors as the Debtors will continue to generate revenue and preserve their business.  In

addition, the Secured Creditors are adequately protected by the proposed replacement liens to the

extent of any diminution that have the same extent, validity, scope, and priority as the prepetition

liens held by the respective Secured Creditors.

Additionally, in determining adequate protection, Courts have stressed the importance of

promoting a debtor's reorganization.  As set forth by the Tenth Circuit in O'Connor:

> In this case, Debtors, in the midst of a Chapter 11 proceeding, have
> proposed to deal with cash collateral for the purpose of enhancing the
> prospects of reorganization.  This quest is the ultimate goal of Chapter
> 11.  Hence,  the Debtor's efforts are not only to be encouraged, but also
> their efforts during the administration of the proceeding are to be
> measured in light of that quest.  Because the ultimate benefit to be
> achieved by a successful reorganization inures to all the creditors of the
> estate, a fair opportunity must be given to the Debtors to achieve that end.
> Thus, while interests of the secured creditor whose property rights are of
> concern to the court, the interests of all other creditors also have bearing
> upon the question of whether use of cash collateral shall be permitted
> during the early stages of administration.

O'Connor, 808 F.2d at 1937.

Likewise, the use of Cash Collateral in this case is critical to the Debtors' ability to

implement an effective reorganization strategy for the benefit of all creditors, and should be

approved.

**C.**    **Emergency Relief and Interim Approval of the Debtors' Use of Cash Collateral Should**
**Be Granted Pending a Final Hearing**

The authorization to use Cash Collateral pending a final hearing will preserve the value of

the Debtors' business only if authorization is granted immediately.  Section 363(c)(3) of the

Bankruptcy Code and Bankruptcy Rule 4001(b)(2) require the Court to schedule a cash collateral

hearing in accordance with the needs of the debtor and conduct a preliminary hearing for the purpose

of authorizing the use of cash collateral to avoid irreparable harm.

In the present case, emergency use of Cash Collateral by the Debtors, pending a final

hearing, is necessary to prevent irreparable harm to the Debtors.  If there is any interruption in the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

1   Debtors' operations, the value of their business will be significantly impaired to the serious

2   detriment of the Debtors, their creditors, employees and customers.

3         On the other hand, the Secured Creditors will suffer little, if any, harm if interim relief is

4   granted.  To the extent that a Secured Creditor has an interest in property of the estates which is

5   entitled to adequate protection, that interest is adequately protected by the preservation of the value

6   of their collateral through the Debtors' continued business operations and the proposed replacement

7   liens.

8         The Motion and proposed Order thereon seek none of the provisions identified in the

9   Statement filed concurrently herewith in accordance with Local Bankruptcy Rule 4001-2(a).

10   **IV.**

11   **CONCLUSION**

12         **WHEREFORE**, for all the foregoing reasons, and such additional reasons as may be

13   addressed at the hearing on this Motion, the Debtors respectfully request that this Court enter an

14   order, substantially in the form of **Exhibit "B"** hereto, (a) granting interim approval of the use of

15   Cash Collateral on an emergency basis, pending a final hearing, in accordance with the Budget;

16   (b) granting adequate protection to the Secured Creditors on an interim basis in the form of

17   replacement liens to the extent necessary to protect the Secured Creditors from a diminution in value

18   of their collateral; (c) scheduling and establishing deadlines regarding a final hearing on the Debtors'

19   use of Cash Collateral, and (d) granting such other and further relief as is just and proper under the

20   circumstances.

21

22   Dated:    August 30, 2018         PACHULSKI STANG ZIEHL & JONES LLP

23

24                   By:    */s/ William N. Lobel*

25                          William N. Lobel
                           [Proposed] Attorneys for Ruby's SoCal

26                           Diners, a Delaware corporation, *et al.*,
                           Debtors and Debtors-in-Possession

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

EXHIBIT "A"

Ruby's Huntington Beach LTD
Weekly Cash Flow Budget

| | Period 9 | | Period 10 | | | | Period 11 | | | | Period 12 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fiscal Period | | | | | | | | | | | | | | |
| Post-Petition Accounting Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
| Week Ending Date | 9/2/2018 | 9/9/2018 | 9/16/2018 | 9/23/2018 | 9/30/2018 | 10/7/2018 | 10/14/2018 | 10/21/2018 | 10/28/2018 | 11/4/2018 | 11/11/2018 | 11/18/2018 | 11/25/2018 | Total |
| **RECEIPTS** | | | | | | | | | | | | | | |
| [1] Restaurant Revenues | 95,540 | 85,540 | 63,493 | 63,492 | 61,492 | 61,492 | 63,707 | 61,707 | 74,708 | 66,707 | 59,025 | 58,025 | 61,025 | 875,953 |
| Gift Card Reimbursement | | | | | 7,500 | | | | 7,500 | | | | | 15,000 |
| Total Receipts | 95,540 | 85,540 | 63,493 | 63,492 | 68,992 | 61,492 | 63,707 | 61,707 | 82,208 | 66,707 | 59,025 | 58,025 | 61,025 | 890,953 |
| **DISBURSEMENTS** | | | | | | | | | | | | | | |
| Operating Expenses | | | | | | | | | | | | | | |
| Cost of Goods Sold | 25,031 | 22,411 | 16,635 | 16,635 | 18,076 | 16,111 | 16,691 | 16,167 | 21,538 | 17,477 | 15,465 | 15,203 | 15,989 | 233,430 |
| [2] Salaries & Employee Related | 74,428 | | 58,976 | | 52,427 | | 49,545 | | 56,951 | | 49,755 | | 47,111 | 389,194 |
| Occupancy Cost | 23,130 | | | | | 23,130 | | | | 23,130 | | | | 69,391 |
| Utility Deposits | 6,670 | | | | | | | | | | | | | 6,670 |
| [3] Other Operating Expenses | 15,485 | 13,864 | 10,291 | 10,291 | 11,182 | 9,966 | 10,325 | 10,001 | 13,324 | 10,812 | 9,567 | 9,405 | 9,891 | 144,403 |
| [6] G&A Fees | 7,644 | 6,844 | 5,080 | 5,080 | 5,520 | 4,920 | 5,097 | 4,937 | 6,578 | 5,337 | 4,723 | 4,643 | 4,883 | 71,286 |
| Total Operating Expenses | 152,389 | 43,120 | 90,982 | 32,006 | 87,205 | 54,128 | 81,658 | 31,106 | 98,391 | 56,757 | 79,509 | 29,250 | 77,873 | 914,374 |
| Non-Operating Expenses | | | | | | | | | | | | | | |
| Capital Improvements | | 170,000 | | | | | | | | | | | | 170,000 |
| FUTA Tax | | 1,958 | | | | | 1,958 | | | | 1,958 | | | 5,874 |
| Total Non-Operating Expenses | - | 171,958 | - | - | - | - | 1,958 | - | - | - | 1,958 | - | - | 175,874 |
| Total Disbursements | 152,389 | 215,078 | 90,982 | 32,006 | 87,205 | 54,128 | 83,616 | 31,106 | 98,391 | 56,757 | 81,467 | 29,250 | 77,873 | 1,090,248 |
| **CASH FLOW FROM OPERATIONS** | (56,849) | (129,538) | (27,489) | 31,486 | (18,213) | 7,364 | (19,909) | 30,601 | (16,183) | 9,950 | (22,442) | 28,775 | (16,848) | (199,295) |
| [5] Restructuring Expenses | | | | | | | | | | | | | | |
| Committee Professionals | | | | | 5,000 | | | | 5,000 | | | | | 10,000 |
| PSZJ | | | | | 25,000 | | | | 25,000 | | | | | 50,000 |
| US Trustee | | | | | 4,875 | | | | | | | | | 4,875 |
| Total Restructuring Expenses | | | | | 34,875 | | | | 30,000 | | | | | 64,875 |
| **NET CASH FLOW AFTER RESTRUCTURING EXPENSES** | (56,849) | (129,538) | (27,489) | 31,486 | (53,088) | 7,364 | (19,909) | 30,601 | (46,183) | 9,950 | (22,442) | 28,775 | (16,848) | (264,170) |
| Beginning Cash | 210,000 | 153,151 | 193,613 | 166,124 | 197,610 | 144,522 | 151,886 | 131,977 | 162,578 | 116,395 | 126,345 | 103,903 | 132,678 | 210,000 |
| Plus / Less: Net Cash Flow | (56,849) | (129,538) | (27,489) | 31,486 | (53,088) | 7,364 | (19,909) | 30,601 | (46,183) | 9,950 | (22,442) | 28,775 | (16,848) | (264,170) |
| Plus / Less: DIP Loan Facility Borrowing / (Paydown) | - | 170,000 | | | | | | | | | | | | 170,000 |
| **ENDING CASH** | 153,151 | 193,613 | 166,124 | 197,610 | 144,522 | 151,886 | 131,977 | 162,578 | 116,395 | 126,345 | 103,903 | 132,678 | 115,830 | 115,830 |
| DIP Loan Facility Availability | | 170,000 | - | - | - | - | - | - | - | - | - | - | - | 170,000 |
| DIP (Draw) / Paydown | | (170,000) | - | - | - | - | - | - | - | - | - | - | - | (170,000) |
| **ENDING LIQUIDITY** | 153,151 | 193,613 | 166,124 | 197,610 | 144,522 | 151,886 | 131,977 | 162,578 | 116,395 | 126,345 | 103,903 | 132,678 | 115,830 | 115,830 |
| **ENDING DIP LOAN BALANCE** | | 170,000 | 170,000 | 170,000 | 170,000 | 170,000 | 170,000 | 170,000 | 170,000 | 170,000 | 170,000 | 170,000 | 170,000 | 170,000 |

**Footnotes**

[1] Restaurant revenues and, therefore, related expenses are impacted by seasonality and weather.

[2] RDI advances payroll funds to a Payroll Processor for all managed restaurant locations, and is fully reimbursed. See Exhibit A.

[3] RDI advances funds for various insurance costs, including Group Health, General Liability, and Workers' Compensation, and is reimbursed by affiliates and employees for the non-covered portion. See Exhibit B.

[4] Percentage rent for 2018 is due January 30, 2019

[5] Restructuring Expenses represent Management's best estimate of costs related to bankruptcy filing - totals may not be all-inclusive.

[6] By Agreement, General and Adminstrative Fees are paid to RDI on a weekly basis.

Ruby's Laguna Hills LTD
Weekly Cash Flow Budget

| | Period 9 | | Period 10 | | | | Period 11 | | | | Period 12 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fiscal Period | | | | | | | | | | | | | | |
| Post-Petition Accounting Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
| Week Ending Date | 9/2/2018 | 9/9/2018 | 9/16/2018 | 9/23/2018 | 9/30/2018 | 10/7/2018 | 10/14/2018 | 10/21/2018 | 10/28/2018 | 11/4/2018 | 11/11/2018 | 11/18/2018 | 11/25/2018 | Total |
| **RECEIPTS** | | | | | | | | | | | | | | |
| [1] Restaurant Revenues | 35,643 | 35,643 | 30,082 | 31,082 | 34,082 | 33,079 | 37,776 | 39,776 | 36,776 | 36,776 | 30,731 | 32,731 | 34,413 | 448,590 |
| Gift Card Reimbursement | | | | | 8,750 | | | | 8,750 | | | | | 17,500 |
| Total Receipts | 35,643 | 35,643 | 30,082 | 31,082 | 42,832 | 33,079 | 37,776 | 39,776 | 45,526 | 36,776 | 30,731 | 32,731 | 34,413 | 466,090 |
| **DISBURSEMENTS** | | | | | | | | | | | | | | |
| Operating Expenses | | | | | | | | | | | | | | |
| Cost of Goods Sold | 9,878 | 9,878 | 8,337 | 8,614 | 11,870 | 9,167 | 10,469 | 11,023 | 12,617 | 10,192 | 8,516 | 9,071 | 9,537 | 129,166 |
| [2] Salaries & Employee Related | 30,129 | | 27,779 | | 31,240 | | 29,947 | | 36,053 | | 28,532 | | 28,379 | 212,059 |
| Occupancy Cost | 18,339 | | | | | 18,339 | | | | 18,339 | | | | 55,017 |
| Utility Deposits | 2,500 | | | | | | | | | | | | | 2,500 |
| [3] Other Operating Expenses | 5,317 | 5,317 | 4,487 | 4,636 | 6,389 | 4,934 | 5,635 | 5,933 | 6,791 | 5,486 | 4,584 | 4,882 | 5,133 | 69,526 |
| [5] G&A Fees | 3,079 | 3,079 | 2,598 | 2,685 | 3,700 | 2,857 | 3,263 | 3,436 | 3,932 | 3,177 | 2,654 | 2,827 | 2,973 | 40,260 |
| Total Operating Expenses | 69,241 | 18,273 | 43,201 | 15,935 | 53,199 | 35,298 | 49,314 | 20,392 | 59,393 | 37,193 | 44,287 | 16,780 | 46,021 | 508,528 |
| Non-Operating Expenses | | | | | | | | | | | | | | |
| FUTA Tax | | 886 | | | | | 886 | | | | 886 | | | 2,658 |
| Total Non-Operating Expenses | - | 886 | - | - | - | - | 886 | - | - | - | 886 | - | - | 2,658 |
| Total Disbursements | 69,241 | 19,159 | 43,201 | 15,935 | 53,199 | 35,298 | 50,200 | 20,392 | 59,393 | 37,193 | 45,173 | 16,780 | 46,021 | 511,186 |
| **CASH FLOW FROM OPERATIONS** | (33,598) | 16,484 | (13,119) | 15,147 | (10,367) | (2,219) | (12,424) | 19,384 | (13,867) | (417) | (14,442) | 15,951 | (11,608) | (45,096) |
| [4] Restructuring Expenses | | | | | | | | | | | | | | |
| Committee Professionals | | | | | 5,000 | | | | 5,000 | | | | | 10,000 |
| PSZJ | | | | | 25,000 | | | | 25,000 | | | | | 50,000 |
| US Trustee | | | | | 1,950 | | | | | | | | | 1,950 |
| Total Restructuring Expenses | - | - | - | - | 31,950 | - | - | - | 30,000 | - | - | - | - | 61,950 |
| **NET CASH FLOW AFTER RESTRUCTURING EXPENSES** | (33,598) | 16,484 | (13,119) | 15,147 | (42,317) | (2,219) | (12,424) | 19,384 | (43,867) | (417) | (14,442) | 15,951 | (11,608) | (107,046) |
| Beginning Cash | 15,000 | (18,598) | (2,115) | (15,234) | (87) | (42,404) | (44,622) | (57,046) | (37,662) | (81,529) | (81,946) | (96,388) | (80,438) | 15,000 |
| Plus / Less: Net Cash Flow | (33,598) | 16,484 | (13,119) | 15,147 | (42,317) | (2,219) | (12,424) | 19,384 | (43,867) | (417) | (14,442) | 15,951 | (11,608) | (107,046) |
| Plus / Less: DIP Loan Facility Borrowing / (Paydown) | - | | | | | | | | | - | | | | - |
| **ENDING CASH** | (18,598) | (2,115) | (15,234) | (87) | (42,404) | (44,622) | (57,046) | (37,662) | (81,529) | (81,946) | (96,388) | (80,438) | (92,046) | (92,046) |
| DIP Loan Facility Availability | | | | | | | | | | | | | | - |
| DIP (Draw) / Paydown | | | | | | | | | | | | | | - |
| **ENDING LIQUIDITY** | (18,598) | (2,115) | (15,234) | (87) | (42,404) | (44,622) | (57,046) | (37,662) | (81,529) | (81,946) | (96,388) | (80,438) | (92,046) | (92,046) |
| **ENDING DIP LOAN BALANCE** | - | - | - | - | - | - | - | - | - | - | - | - | - | |

Footnotes
[1] Restaurant revenues and, therefore, related expenses are impacted by seasonality and weather.
[2] RDI advances payroll funds to a Payroll Processor for all managed restaurant locations, and is fully reimbursed. See Exhibit A.
[3] RDI advances funds for various insurance costs, including Group Health, General Liability, and Workers' Compensation, and is reimbursed by affiliates and employees for the non-covered portion. See Exhibit B.
[4] Restructuring Expenses represent Management's best estimate of costs related to bankruptcy filing - totals may not be all-inclusive.
[5] By Agreement, General and Adminstrative Fees are paid to RDI on a weekly basis.

Ruby's Oceanside LTD
Weekly Cash Flow Budget

| | Period 9 | | Period 10 | | | | Period 11 | | | | Period 12 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fiscal Period | | | | | | | | | | | | | | |
| Post-Petition Accounting Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
| Week Ending Date | 9/2/2018 | 9/9/2018 | 9/16/2018 | 9/23/2018 | 9/30/2018 | 10/7/2018 | 10/14/2018 | 10/21/2018 | 10/28/2018 | 11/4/2018 | 11/11/2018 | 11/18/2018 | 11/25/2018 | Total |
| **RECEIPTS** | | | | | | | | | | | | | | |
| [1] Restaurant Revenues | 99,712 | 99,712 | 62,340 | 56,340 | 68,340 | 62,341 | 62,644 | 57,644 | 54,644 | 75,644 | 52,973 | 53,973 | 54,976 | 861,283 |
| Gift Card Reimbursement | | | | | 5,000 | | | | 5,000 | | | | | 10,000 |
| Total Receipts | 99,712 | 99,712 | 62,340 | 56,340 | 73,340 | 62,341 | 62,644 | 57,644 | 59,644 | 75,644 | 52,973 | 53,973 | 54,976 | 871,283 |
| **DISBURSEMENTS** | | | | | | | | | | | | | | |
| _Operating Expenses_ | | | | | | | | | | | | | | |
| Cost of Goods Sold | 26,125 | 26,125 | 16,333 | 14,761 | 19,215 | 16,333 | 16,413 | 15,103 | 15,627 | 19,819 | 13,879 | 14,141 | 14,404 | 228,276 |
| [2] Salaries & Employee Related | 78,053 | | 63,426 | | 50,756 | | 48,918 | | 45,906 | | 50,340 | | 42,642 | 380,041 |
| Occupancy Cost | 16,553 | | | | | 16,553 | | | | 16,553 | | | | 49,660 |
| Utility Deposits | 11,000 | | | | | | | | | | | | | 11,000 |
| [3] Other Operating Expenses | 16,776 | 16,776 | 10,488 | 9,479 | 12,339 | 10,488 | 10,539 | 9,698 | 10,035 | 12,727 | 8,912 | 9,081 | 9,249 | 146,588 |
| [5] G&A Fees | 7,959 | 7,959 | 4,976 | 4,497 | 5,854 | 4,976 | 5,000 | 4,601 | 4,761 | 6,038 | 4,228 | 4,308 | 4,388 | 69,544 |
| Total Operating Expenses | 156,466 | 50,859 | 95,223 | 28,737 | 88,164 | 48,351 | 80,871 | 29,402 | 76,328 | 55,137 | 77,359 | 27,530 | 70,683 | 885,109 |
| _Non-Operating Expenses_ | | | | | | | | | | | | | | |
| FUTA Tax | | 1,659 | | | | | 1,659 | | | | 1,659 | | | 4,977 |
| Total Non-Operating Expenses | - | 1,659 | - | - | - | - | 1,659 | - | - | - | 1,659 | - | - | 4,977 |
| Total Disbursements | 156,466 | 52,518 | 95,223 | 28,737 | 88,164 | 48,351 | 82,530 | 29,402 | 76,328 | 55,137 | 79,018 | 27,530 | 70,683 | 890,086 |
| **CASH FLOW FROM OPERATIONS** | (56,754) | 47,194 | (32,883) | 27,603 | (14,824) | 13,990 | (19,886) | 28,242 | (16,684) | 20,507 | (26,045) | 26,443 | (15,707) | (18,803) |
| [4] _Restructuring Expenses_ | | | | | | | | | | | | | | |
| Committee Professionals | | | | | 5,000 | | | | 5,000 | | | | | 10,000 |
| PSZJ | | | | | 25,000 | | | | 25,000 | | | | | 50,000 |
| US Trustee | | | | | 4,875 | | | | | | | | | 4,875 |
| Total Restructuring Expenses | - | - | - | - | 34,875 | - | - | - | 30,000 | - | - | - | - | 64,875 |
| **NET CASH FLOW AFTER RESTRUCTURING EXPENSES** | (56,754) | 47,194 | (32,883) | 27,603 | (49,699) | 13,990 | (19,886) | 28,242 | (46,684) | 20,507 | (26,045) | 26,443 | (15,707) | (83,678) |
| Beginning Cash | 72,000 | 15,246 | 62,440 | 29,557 | 57,160 | 7,461 | 21,451 | 1,565 | 29,807 | 8,123 | 28,631 | 2,585 | 29,029 | 72,000 |
| Plus / Less: Net Cash Flow | (56,754) | 47,194 | (32,883) | 27,603 | (49,699) | 13,990 | (19,886) | 28,242 | (46,684) | 20,507 | (26,045) | 26,443 | (15,707) | (83,678) |
| Plus / Less: DIP Loan Facility Borrowing / (Paydown) | - | - | - | - | - | - | - | - | 25,000 | - | - | - | - | 25,000 |
| **ENDING CASH** | 15,246 | 62,440 | 29,557 | 57,160 | 7,461 | 21,451 | 1,565 | 29,807 | 8,123 | 28,631 | 2,585 | 29,029 | 13,322 | 13,322 |
| DIP Loan Facility Availability | | | - | - | - | - | - | - | 25,000 | | | | | 25,000 |
| DIP (Draw) / Paydown | | - | - | - | - | - | - | - | (25,000) | | | | | (25,000) |
| **ENDING LIQUIDITY** | 15,246 | 62,440 | 29,557 | 57,160 | 7,461 | 21,451 | 1,565 | 29,807 | 8,123 | 28,631 | 2,585 | 29,029 | 13,322 | 13,322 |
| **ENDING DIP LOAN BALANCE** | | - | - | - | - | - | - | - | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 |

**Footnotes**

[1] Restaurant revenues and, therefore, related expenses are impacted by seasonality and weather.

[2] RDI advances payroll funds to a Payroll Processor for all managed restaurant locations, and is fully reimbursed. See Exhibit A.

[3] RDI advances funds for various insurance costs, including Group Health, General Liability, and Workers' Compensation, and is reimbursed by affiliates and employees for the non-covered portion. See Exhibit B.

[4] Restructuring Expenses represent Management's best estimate of costs related to bankruptcy filing - totals may not be all-inclusive.

[5] By Agreement, General and Adminstrative Fees are paid to RDI on a weekly basis.

Ruby's Palm Springs LTD
Weekly Cash Flow Budget

| | Period 9 | | Period 10 | | | | Period 11 | | | | Period 12 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Post-Petition Accounting Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Total |
| Week Ending Date | 9/2/2018 | 9/9/2018 | 9/16/2018 | 9/23/2018 | 9/30/2018 | 10/7/2018 | 10/14/2018 | 10/21/2018 | 10/28/2018 | 11/4/2018 | 11/11/2018 | 11/18/2018 | 11/25/2018 | |
| **RECEIPTS** | | | | | | | | | | | | | | |
| [1] Restaurant Revenues | 45,894 | 45,889 | 31,717 | 37,717 | 39,717 | 39,539 | 36,103 | 40,101 | 38,101 | 38,101 | 41,521 | 42,523 | 42,521 | 519,444 |
| Gift Card Reimbursement | | | | | 5,000 | | | | 5,000 | | | | | 10,000 |
| Total Receipts | 45,894 | 45,889 | 31,717 | 37,717 | 44,717 | 39,539 | 36,103 | 40,101 | 43,101 | 38,101 | 41,521 | 42,523 | 42,521 | 529,444 |
| **DISBURSEMENTS** | | | | | | | | | | | | | | |
| Operating Expenses | | | | | | | | | | | | | | |
| Cost of Goods Sold | 12,529 | 12,528 | 8,659 | 10,297 | 12,208 | 10,794 | 9,856 | 10,948 | 11,767 | 10,402 | 11,335 | 11,609 | 11,608 | 144,538 |
| [2] Salaries & Employee Related | 35,521 | | 30,033 | | 31,902 | | 29,273 | | 32,199 | | 30,813 | | 32,912 | 222,653 |
| Occupancy Cost | | | | 20,592 | | | | 20,592 | | | | | 20,592 | 61,776 |
| Utility Deposits | 3,770 | | | | | | | | | | | | | 3,770 |
| [3] Other Operating Expenses | 7,582 | 7,581 | 5,240 | 6,231 | 7,387 | 6,532 | 5,964 | 6,625 | 7,120 | 6,294 | 6,859 | 7,025 | 7,025 | 87,465 |
| [5] G&A Fees | 3,714 | 3,713 | 2,566 | 3,052 | 3,618 | 3,199 | 2,921 | 3,245 | 3,488 | 3,083 | 3,360 | 3,441 | 3,441 | 42,840 |
| Total Operating Expenses | 63,116 | 23,822 | 46,498 | 40,172 | 55,115 | 20,525 | 48,015 | 41,409 | 54,573 | 19,779 | 52,368 | 22,074 | 75,577 | 563,042 |
| Non-Operating Expenses | | | | | | | | | | | | | | |
| FUTA Tax | | 897 | | | | | 897 | | | | 897 | | | 2,691 |
| Total Non-Operating Expenses | - | 897 | - | - | - | - | 897 | - | - | - | 897 | - | - | 2,691 |
| Total Disbursements | 63,116 | 24,719 | 46,498 | 40,172 | 55,115 | 20,525 | 48,912 | 41,409 | 54,573 | 19,779 | 53,265 | 22,074 | 75,577 | 565,733 |
| **CASH FLOW FROM OPERATIONS** | (17,222) | 21,170 | (14,781) | (2,455) | (10,398) | 19,014 | (12,809) | (1,308) | (11,472) | 18,322 | (11,744) | 20,449 | (33,056) | (36,289) |
| [4] Restructuring Expenses | | | | | | | | | | | | | | |
| Committee Professionals | | | | | 5,000 | | | | 5,000 | | | | | 10,000 |
| PSZJ | | | | | 25,000 | | | | 25,000 | | | | | 50,000 |
| US Trustee | | | | | 1,950 | | | | | | | | | 1,950 |
| Total Restructuring Expenses | - | - | - | - | 31,950 | - | - | - | 30,000 | - | - | - | - | 61,950 |
| **NET CASH FLOW AFTER RESTRUCTURING EXPENSES** | (17,222) | 21,170 | (14,781) | (2,455) | (42,348) | 19,014 | (12,809) | (1,308) | (41,472) | 18,322 | (11,744) | 20,449 | (33,056) | (98,239) |
| Beginning Cash | 20,000 | 2,778 | 23,948 | 9,167 | 66,713 | 24,365 | 43,379 | 30,570 | 29,262 | 12,790 | 31,112 | 19,368 | 39,817 | 20,000 |
| Plus / Less: Net Cash Flow | (17,222) | 21,170 | (14,781) | (2,455) | (42,348) | 19,014 | (12,809) | (1,308) | (41,472) | 18,322 | (11,744) | 20,449 | (33,056) | (98,239) |
| Plus / Less: DIP Loan Facility Borrowing / (Paydown) | - | - | - | 60,000 | - | - | - | - | 25,000 | - | - | - | - | 85,000 |
| **ENDING CASH** | 2,778 | 23,948 | 9,167 | 66,713 | 24,365 | 43,379 | 30,570 | 29,262 | 12,790 | 31,112 | 19,368 | 39,817 | 6,761 | 6,761 |
| DIP Loan Facility Availability | | | | 85,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | - | - | - | - | 85,000 |
| DIP (Draw) / Paydown | | - | - | (60,000) | | | | | (25,000) | | | | - | (85,000) |
| **ENDING LIQUIDITY** | 2,778 | 23,948 | 9,167 | 91,713 | 49,365 | 68,379 | 55,570 | 54,262 | 12,790 | 31,112 | 19,368 | 39,817 | 6,761 | 6,761 |
| **ENDING DIP LOAN BALANCE** | | | | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 85,000 | 85,000 | 85,000 | 85,000 | 85,000 | 85,000 |

Footnotes

[1]  Restaurant revenues and, therefore, related expenses are impacted by seasonality and weather.

[2]  RDI advances payroll funds to a Payroll Processor for all managed restaurant locations, and is fully reimbursed.  See Exhibit A.

[3]  RDI advances funds for various insurance costs, including Group Health, General Liability, and Workers' Compensation, and is reimbursed by affiliates and employees for the non-covered portion.  See Exhibit B.

[4]  Restructuring Expenses represent Management's best estimate of costs related to bankruptcy filing - totals may not be all-inclusive.

[5]  By Agreement, General and Adminstrative Fees are paid to RDI on a weekly basis.

EXHIBIT "B"

1    William N. Lobel (CA Bar No. 93202)
     PACHULSKI STANG ZIEHL & JONES LLP
2    650 Town Center Drive, Suite 1500
     Costa Mesa, CA  92626
3    Telephone:  (714) 384-4740
     Facsimile:  (714) 384-4741
4    E-mail:    wlobel@pszjlaw.com

5    [Proposed] Attorneys for Ruby's SoCal Diners,
     a Delaware corporation, *et al.*, Debtors and
6    Debtors-in-Possession

7

8                    **UNITED STATES BANKRUPTCY COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10                        **SANTA ANA DIVISION**

11   In re:                                | Case No. 8:18-bk-13197 CB

12   RUBY'S SOCAL DINERS, LLC,             | Chapter 11
     a Delaware limited liability company, *et al.*,[1]
13                                         | Jointly Administered with Case Nos.
              Debtors and Debtors-in-
14                  Possession,            | 8:18-13198-CB; 8:18-13199-CB; 8:18-13200-
                                           | CB; 8:18-13201-CB; 8:18-13202-CB
15   Affects:

16   ☒  All Debtors                        | **INTERIM ORDER (A) AUTHORIZING
                                           | USE OF CASH COLLATERAL,**
17   ☐  RUBY'S SOCAL DINERS, LLC, ONLY     | **(B) GRANTING ADEQUATE
                                           | PROTECTION FOR USE OF
18   ☐  RUBY'S QUALITY DINERS, LLC, ONLY   | PREPETITION COLLATERAL, AND
                                           | (C) GRANTING RELATED RELIEF**
19   ☐  RUBY'S HUNTINGTON BEACH, LTD.,
20      ONLY                               | Date:      August 31, 2018
                                           | Time:      10:00 a.m.
21   ☐  RUBY'S LAGUNA HILLS, LTD. ONLY     | Place:     Courtroom  5D
                                           |            411 West Fourth Street
22   ☐  RUBY'S OCEANSIDE, LTD., ONLY       |            Santa Ana, CA  92701

23   ☐  RUBY'S PALM SPRINGS, LTD., ONLY

24

25

26

27   _____
     [1] The last four digits of the Debtors' federal tax identification numbers are as follows: Ruby's SoCal Diners, LLC
28   (9782); Ruby's Quality Diners, LLC (8143); Ruby's Huntington Beach, Ltd. (1331); Ruby's Laguna Hills, Ltd. (6603);
     Ruby's Oceanside, Ltd. (9154); and Ruby Palm Springs, Ltd. (9627).

DOCS_LA:316224.5 76135/001                    -1-

1    Upon consideration of the *Notice of Emergency Motion and Emergency Motion By Debtors*

2  *For Order (A) Authorizing Interim Use of Cash Collateral, (B) Granting Adequate Protection for*

3  *Use of Prepetition Collateral, and (C) Granting Related Relief* [Docket No. __] (the "Cash

4  Collateral Motion"),[2] pursuant to section 363(c) of title 11 of the United States Code (the

5  "Bankruptcy Code") and Rule 4001(b) of the Federal Rules of Bankruptcy Procedure (the

6  "Bankruptcy Rules"); and it appearing that the Court has jurisdiction over the matter pursuant to 28

7  U.S.C. §§ 1334 and 157; and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408

8  and 1409; and due and proper notice of the Cash Collateral Motion having been provided to the

9  (1) the Office of the United States Trustee; (2) the creditors appearing on the lists filed in accordance

10  with Fed. R. Bankr. P. 1007(d) by the Debtors unless and until an official committee of unsecured

11  creditors (the "Committee") is appointed, then in that event, to counsel to the Committee; (3) parties

12  that file with the Court and serve upon the Debtors request for notice of all matters in accordance

13  with Bankruptcy Rule 2002(i); (4) the United States of America; (5) the State of California, and

14  (6) the Secured Creditors (as defined in the Cash Collateral Motion) or their counsel of record (the

15  "Notice Parties"); and the Court having found and determined that the requested relief sought in the

16  Cash Collateral Motion is in the best interests of the Debtors, their estates, creditors, and all parties

17  in interest and that the legal and factual bases set forth in the Cash Collateral Motion and in the

18  concurrently filed *Declaration of Douglas S. Cavanaugh filed in Support of First Day Motions* (the

19  "Cavanaugh Declaration") establish just cause for the relief granted herein; having considered all

20  relevant matters related thereto, and being otherwise fully advised in the premises; and after due

21  deliberation and sufficient cause appearing thereof, the Court makes the following findings of fact

22  and conclusions of law:

23    A.    Adequate and sufficient notice of the Cash Collateral Motion and the hearing on

24  interim approval sought thereby has been provided to all persons entitled thereto under Rule 2002

25  and 4001 of the Bankruptcy Rules and no further notice of the interim relief requested by the Cash

26  Collateral Motion is necessary.

27

28
---
[2]  Capitalized terms used but otherwise not defined herein shall have the meanings ascribed to them in the Cash Collateral Motion.

B.      This matter constitutes a "core proceeding" within the meaning of 28 U.S.C. § 157.

C.      This Court has jurisdiction over the parties and the subject matter of this proceeding pursuant to 28 U.S.C. §§ 1334 and 157.

D.      It is in the best interests of the Debtors 'estates that, in exchange for providing adequate protection to the Secured Creditors as set forth in the Cash Collateral Motion, the Debtors be allowed to utilize Cash Collateral (as defined below) on an interim basis under the terms and conditions set forth herein to permit the Debtors to operate their business and administer their bankruptcy estates through the date of the final hearing on the Cash Collateral Motion.

E.      The Secured Creditors assert that certain prepetition obligations of Debtors to the Secured Creditors were, as of the Petition Date, secured by valid, enforceable and properly perfected liens on and security interests in the Debtors' property and other assets as more particularly described in the Cash Collateral Motion (collectively, the "Prepetition Collateral"), including, without limitation, cash on hand of the Debtors and cash and receipts generated by the operation of the Debtors' business, which funds constitute "cash collateral" within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").

F.      The Debtors have requested that the Court authorize the Debtors' interim use of Cash Collateral for the purposes set forth in the budget attached as **Exhibit "A"** to the Cash Collateral Motion (the "Budget") through the final hearing on the Cash Collateral Motion.

G.      Subject to compliance with the conditions of this Interim Order, the Debtors are permitted to use Cash Collateral during the requested period, and in the amounts set forth in the Budget, subject to applicable variances, or for other purposes upon the consent of Secured Creditors or further Court order after notice, an opportunity to object, and a hearing.

H.      This Interim Order is entered pursuant to, and shall be construed and be consistent with sections 361 and 363 of the Bankruptcy Code and Bankruptcy Rule 4001(b).

**IT IS ORDERED THAT:**

1.      The Debtors shall be, and hereby are, authorized to use Cash Collateral on an interim basis through the earlier of the final hearing on the Cash Collateral Motion on the terms and conditions set forth in this Interim Order.  The Debtors are authorized to use Cash Collateral in

accordance with the Budget; provided, however, that to the extent the Debtors exceed the amounts authorized in the Budget, the Debtors may not exceed fifteen percent 15% of the aggregate of the weekly expenditures reflected on the Budget, measured on a four-week rolling basis, pending either agreement of the parties or Order of the Court.

2.      All objections to the Cash Collateral Motion or the relief requested therein that have not been made, or that have been withdrawn, waived, or settled, and all reservations of rights included therein, hereby are overruled on the merits.

3.      As received, the Debtors shall deposit into the Debtors' segregated debtor-in-possession accounts (the "DIP Operating Accounts") (or such other debtor-in-possession accounts agreed to in writing by the Secured Creditors) all Cash Collateral collected by the Debtors.

4.      The Court hereby grants claims against the Debtors' estates in favor of the Secured Creditors as adequate protection to the same extent, validity and priority of the Secured Creditors' prepetition liens, which claims shall be in the amount of any postpetition diminution in the value of the Secured Creditors' interests in the Cash Collateral (the "Adequate Protection Claims").

5.      To secure the Adequate Protection Claims, the Court hereby grants the Secured Creditors replacement security interests and liens (collectively, the "Adequate Protection Liens") in their respective prepetition collateral (the "Prepetition Collateral"), the DIP Operating Accounts, all assets (whenever acquired) acquired by Debtors with proceeds of the Prepetition Collateral or Cash Collateral, and all proceeds thereof to the same extent, validity and priority of Secured Creditors' respective prepetition liens and security interests (excluding, however, all claims, causes of action and proceeds thereof arising under sections 105, 506(c), 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552 and 553 of the Bankruptcy Code (collectively, "Avoidance Actions") (the "Adequate Protection Collateral" and, collectively with the Prepetition Collateral and the DIP Operating Accounts, the "Collateral").

6.      The Debtors and their estates reserve all rights with respect to any challenge to the validity and/or scope of the prepetition claims and liens of the Secured Creditors, or the avoidability thereof.  Nothing herein is intended to waive the rights of the Debtors (or any Committee appointed in the Debtors' cases or other interested party) with respect to such issues.

7.      The Adequate Protection Liens granted to the respective Secured Creditors pursuant to this Order are perfected by operation of law *nunc pro tunc* from the Petition Date without further action by Secured Creditors.  Secured Creditors may, but shall not be required to, file any Uniform Commercial Code financing statements and record any additional documents in any jurisdiction or take any other or further action to validate or perfect the security interests and liens granted to them pursuant to and in accordance with this Order, without any consent of the Debtors and without any further order of the Court.  If any Secured Creditor deems it necessary or convenient, the Debtors shall execute and deliver to that Secured Creditor, or shall have executed and delivered to that Secured Creditor, all in form and substance satisfactory to the Secured Creditor, any other documents, instruments or writings to evidence the terms of this Order, the use of Cash Collateral and/or Secured Creditors' liens and security interests, and Secured Creditors may request from time to time the execution and delivery of Uniform Commercial Code financing statements, continuation statements, amendments to financing statements, and any other instruments and/or documents relating to the use of Cash Collateral and/or the security interests and liens granted hereunder.  The Debtors shall execute all financing statements, amendments and other documents desired by any Secured Creditors for the perfection of the security interests and liens granted hereunder and the Debtors agree to a lifting of the automatic stay for the limited purpose of carrying out the purposes of this Paragraph.  Furthermore, the Debtors irrevocably authorize the filing of a carbon, photographic or other reproduction of this Order as a financing statement, and agree that such filing is sufficient as a financing statement subject to applicable state law.  Nothing in this Paragraph shall limit or otherwise derogate the perfection of Secured Creditors' respective security interests in and lien on the Adequate Protection Collateral by operation of law as provided for in this Order.  All of the security interests in and liens on the Adequate Protection Collateral granted hereunder are hereby deemed to be effective on and after the Petition Date, shall continue in full force and effect and shall survive the termination of Debtors' use of Cash Collateral and the dismissal or conversion of these cases.

9.      The terms of this Order shall survive the termination of Debtors' authority to use Cash Collateral and the dismissal or conversion of these cases.

DOCS_LA:316224.5 76135/001

-5-

10.     Notwithstanding Bankruptcy Rule 7062, the terms and conditions of this Interim Order shall: (a) be immediately enforceable pursuant to Bankruptcy Rule 8005; and (b) not be stayed absent: (i) an application by a party in interest for such stay in conformance with such Bankruptcy Rule 8005; and (ii) a hearing upon notice to the Debtors.

11.     The Debtors shall forthwith serve by first-class United States Mail a copy of this Interim Order upon the Notice Parties.

12.     A final hearing on the Cash Collateral Motion is scheduled for [_____, 2018, at _____].

13.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to this Interim Order.  To the extent not otherwise addressed in this Interim Order, the Debtors and the Secured Creditors reserve all of their respective rights.

# # #